UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN BALZER,<br><br>Defendant | Criminal No. 20cr10158<br><br>Violations:<br><br>Count One: Conspiracy<br>(18 U.S.C. § 371)<br><br>Count Two: Tampering with a Witness, Victim, or an Informant<br>(18 U.S.C. § 1512(b))<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

1. The defendant, JOHN BALZER ("BALZER"), lived in Lenexa, Kansas and was the owner of BIOinnovations LLC ("BIOinnovations").

2. BIOinnovations was a limited liability company located at 8645 Woodland Terrace, Lenexa, Kansas, 66220. Among other things, BIOinnovations acted as a distributor for medical device manufacturers.

3. Surgeon A was a spine surgeon who lived in Lawson, Missouri and practiced medicine in Missouri and Kansas.

4. Device Company was a medical device company located in Malden, Massachusetts that sold implants used in spine surgeries, such as plates, cages, screws, rods, and biologics. While Device Company employed sales representatives to assist and provide support

1

to physicians who used its products, Device Company worked with distributors, like BIOinnovations and BALZER, to provide customer support in some areas of the country. Distributors like BIOinnovations and BALZER were independent contractors and not full-time employees of Device Company.

5. Executive 1 was Device Company's President, Chief Executive Officer, and Director.

6. Executive 2 was Device Company's Chief Financial Officer and Vice President of Business Development.

7. Expert Company was a limited liability company owned by Executive 1 that purported to manage the process under which Device Company's physician-consultants received payments for their purported consulting beginning in 2013.

<u>Background on Spine Surgeries and Their Reimbursement</u>

8. Hospitals or surgical centers where surgeons perform spine surgeries, such as spinal fusion surgery, typically submit a bill to a patient or a claim for reimbursement to an insurance carrier, including the Medicare Program ("Medicare") or Medicaid Program ("Medicaid"), for the costs associated with a surgery, including the costs of medical device, such as spinal implants. Physicians typically submit a separate claim for reimbursement to patients and/or insurance carriers, including Medicare or Medicaid, for the physician's services rendered during the surgical procedure.

9. Spinal implants, such as screws, rods, cages, and plates are often kept in trays or kits that are held on a consignment basis at a hospital or surgical center where physicians perform spine surgeries. When a physician uses a spinal implant in a surgery, such as a spinal

fusion procedure, the hospital or surgical center orders a replenishment implant and pays the implant manufacturer for that replenished implant. Often, a hospital or surgical center sends replenishment orders to an implant manufacturer, like Device Company, on a surgery-by-surgery basis so that kits or trays from which the implant was used are complete and ready to be used in a future surgery.

The Medicare and Medicaid Programs

10. Medicare is a federally-funded health care program that provides benefits to individuals who are sixty-five years of age or older, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b). Individuals who qualify for Medicare benefits are commonly referred to as Medicare "beneficiaries."

11. Medicare is subdivided into multiple Parts. Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care.

12. Medicaid is a jointly-funded, federal and state health care program that provides certain health benefits to the disabled, as well as to individuals and families with low incomes and resources. At the federal level, Medicaid is administered by CMS. CMS is responsible for overseeing the Medicaid program in participating states, including Massachusetts, Kansas, and Missouri.

13. Medicare and Medicaid are "health care benefit programs" within the meaning of 18 U.S.C. § 24(b), and each is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), the federal Anti-Kickback Statute.

## Overview of the Conspiracy

14. Between late 2012 and October 2015, BALZER, Surgeon A, and their co-conspirators engaged in a scheme in which Device Company paid Surgeon A $379,000 pursuant to a sham consulting program that paid Surgeon A between $500 and $750 per hour for supposedly performing consulting services. Although Device Company's physician-consulting program was purportedly directed at gathering technical feedback about its products from surgeons, in fact, Device Company used the program, and the kickbacks it paid to Surgeon A pursuant to that program, to induce Surgeon A to order and use Device Company's products and to reward his use of Device Company's products. Over the period of time covered by the conspiracy, BALZER, Surgeon A, and their co-conspirators represented that Surgeon A had spent hundreds of hours evaluating products, discussing industry trends, and educating residents. In fact, as BALZER and Surgeon A well knew, Surgeon A spent only a small fraction of his reported time performing actual consulting activities for Device Company. In exchange for the consulting payments from Device Company, Surgeon A used over $4.5 million of Device Company's products in his surgeries, including excessive amounts of certain products. During this time, Surgeon A performed numerous surgeries on patients who were Medicare or Medicaid beneficiaries, often with the assistance of BALZER. Device Company agreed with BALZER to pay him a 25% commission on all Device Company products Surgeon A used in his surgeries.

Object and Purpose of the Kickback Conspiracy

15. The object of the conspiracy was for BALZER, Surgeon A, and their co-conspirators to unlawfully enrich themselves by offering, paying, soliciting, and receiving kickbacks aimed at inducing Surgeon A to order, arrange for, use, and recommend Device Company's spinal implants in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

The Manner and Means

16. Among the manner and means by which BALZER, Surgeon A, and their co-conspirators, known and unknown, carried out the conspiracy were the following:

   a. Setting up a sham physician-consulting program at Device Company purportedly directed at gathering technical feedback about Device Company's products.

   b. Selecting surgeons like Surgeon A to participate in Device Company's sham physician-consulting program based not on their background, qualifications, education, and experience, but instead on their ability and willingness to use Device Company's products.

   c. Executing a sham consulting agreement under which Surgeon A would be paid for using Device Company's spine products in his spine surgeries.

   d. Arranging for Surgeon A to receive 10% of the revenue Device Company generated from Surgeon A's use of Device Company's products in his surgeries.

e. Filling out and submitting to Device Company falsified timesheets representing that Surgeon A had performed a significant number of hours of consulting work for Device Company, when, in fact, Surgeon A did little to no consulting work for Device Company and instead simply used Device Company's products in his surgeries often in the presence of, or at the prompting of, BALZER.

f. Paying Surgeon A for his use of Device Company's products in his spine surgeries under the pretext that he performed consulting work.

g. Tracking the sales volumes of Surgeon A and other physician-consultants and using that information to determine how much Surgeon A and other physician-consultants would be paid.

h. Using, and arranging for the use of, an excessive amount of Device Company's spine products in Surgeon A's spine surgeries.

i. Increasing Surgeon A's hourly rate based not on his experience or the quality of his work, but on his anticipated use of Device Company's products in his surgeries.

Overt Acts in Furtherance of the Conspiracy

17. From in or about late 2012 through October 2015, BALZER, Surgeon A, and their co-conspirators known and unknown to the U.S. Attorney, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

*Executive 2 agreed to pay Surgeon A 10% of the revenue Surgeon A's surgeries generated for Device Company and paid Surgeon A Kickback #1*

a. In late 2012 / early 2013, BALZER had a phone conversation with Executive 2 about Surgeon A becoming a consultant. In that conversation, Executive 2 told BALZER that Surgeon A would get 10% of the revenue Device Company made from Surgeon A's surgeries.

b. On or about March 8, 2013, Surgeon A had a phone conversation with Executive 1 in which Executive 1 told Surgeon A that he wanted Surgeon A to use as many different Device Company products as he could. Executive 1 told Surgeon A that the more products Surgeon A used, the more money Surgeon A would make.

c. On or about March 11, 2013, Executive 2 sent an email to Surgeon A attaching a Clinical Advisor / Consulting Agreement that permitted Surgeon A to bill Device Company up to 600 hours and $300,000 annually based on Surgeon A's "increased interest and availability for feedback on several" Device Company products.

d. On or about March 12, 2013, Surgeon A had a conversation with a Territory Sales Manager for Device Company in which Surgeon A and he discussed using Device Company's product for all of his cases. On that same date, the Territory Sales Manager sent an email to Executive 1 and Executive 2 explaining that he had spoken to Surgeon A, who "understands our position is willing to totally involve himself and use [Device Company] for all of his cases."

e. On or about May 13, 2013, an employee of Device Company sent an email to Executive 2, copying Executive 1. In that email, the employee explained that he had spoken to Surgeon A and that Surgeon A wanted to know the start date of his consulting

7

agreement and wanted to "backdate based on previous cases" he had performed using Device Company product.

   f. On or about May 22, 2013, Device Company sent Check No. 3185 signed by Executive 1 to Surgeon A in the amount of $5,000. At this point time, Surgeon A had not signed his consulting agreement with Device Company and had not submitted any timesheets documenting any purported consulting he performed.

*Kickback #2 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between May 1, 2013 and June 15, 2013*

   g. On or about June 15, 2013, BALZER faxed to Device Company an Exhibit A timesheet prepared by BALZER stating that Surgeon A had performed 75 hours of consulting for Device Company between May 1, 2013 and June 15, 2013, when, in fact, BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 75 hours of consulting. During that six-week time period and pursuant to Surgeon A's agreement with Device Company, Surgeon A used $388,985 worth of Device Company products in his surgeries, including a single surgery on a Medicare beneficiary on or about June 10, 2013 in which he generated $95,950 in revenue for Device Company by using an excessive amount of Device Company's biologic product ("Biologic 1"). Executive 2 signed Surgeon A's timesheet and approved the 75 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

   h. On or about June 20, 2013, Device Company paid BALZER's distribution company, BIOinnovations, $63,750 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between May 1, 2013 and June 15, 2013.

8

      i.      On or about July 11, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3380 signed by Executive 1 to Surgeon A in the amount of $37,500, or approximately 10% of the amount Surgeon A's surgeries generated for Device Company between May 1, 2013 and June 15, 2013.

*Kickback #3 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between June 16, 2013 and August 1, 2013*

      j.      On August 1, 2013, BALZER faxed to Device Company a timesheet he prepared stating that Surgeon A had performed 84 hours of consulting for Device Company between June 16, 2013 and August 1, 2013 when, in fact, both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 84 hours of consulting. During that six-week time period, Surgeon A used $420,135 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about July 22, 2013 in which he generated $104,800 in revenue for Device Company by using an excessive amount of Biologic 1. Executive 2 signed Surgeon A's timesheet and approved the 84 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

      k.      On or about July 22, 2013, Device Company paid BIOinnovations $73,106.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between June 16, 2013 and August 1, 2013.

      l.      On or about September 17, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3666 signed by Executive 1 to Surgeon A in the amount of $42,000, or approximately 10% of the

revenue Surgeon A's surgeries generated for Device Company between June 16, 2013 and August 1, 2013.

*Kickback #4 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between August 2, 2013 and September 15, 2013*

  m. On or about October 3, 2013, BALZER faxed to Device Company a timesheet BALZER prepared stating that Surgeon A had performed 24 hours of consulting for Device Company between August 2, 2013 and September 15, 2013 when both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 24 hours of consulting. During that six-week time period, Surgeon A used $125,805 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.  Executive 2 signed Surgeon A's timesheet and approved the 24 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

  n. On or about October 4, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3739 signed by Executive 1 to Surgeon A in the amount of $12,000, or approximately 10% of the revenue Surgeon A's surgeries generated for Device Company between August 1, 2013 and September 15, 2013.

  o. On or about September 23, 2013 and October 21, 2013, Device Company paid BIOinnovations $91,455 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between August 2, 2013 and September 15, 2013.

p.  On or about October 4, 2013, Executive 2 sent an email to Surgeon A, BALZER and Executive 1, attaching a new, sham consulting agreement under which Expert Company (whose only employee was Executive 1's then girlfriend) would pay Surgeon A for consulting hours Surgeon A purportedly performed for Device Company, which was one of Expert Company's clients. While the email and agreement implied that Device Company was one of a number of clients of Expert Company, Device Company was in fact Expert Company's only client.

*Kickback #5 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product in March 2014*

q.  On or about May 5, 2014, BALZER faxed a timesheet that he prepared and that Surgeon A signed, to Expert Company, which was handling consulting payments for Device Company pursuant to the new consulting agreement. The timesheet stated that Surgeon A had performed 32 hours of consulting for Device Company in March 2014, when both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than even 20 hours of consulting. During that month, Surgeon A used $100,945 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries. On or about May 5, 2014, Executive 2 signed Surgeon A's timesheet and approved the 20 hours (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

r.  On or about April 21, 2014, Device Company paid BIOinnovations $80,785 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries during March 2014.

s.  On or about May 13, 2014, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008031 to Surgeon A in the amount of $9,500, or approximately 10% of the amount Surgeon A's surgeries generated for Device Company during March 2014, minus a 5% fee charged by Expert Company.

*Kickback #6 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between July 2014 and October 2014*

t.  On or about December 6, 2014 and December 10, 2014, BALZER sent Expert Company two timesheets he prepared with Surgeon A's signature stating that Surgeon A had performed 80 hours of consulting for Device Company between July and October 2014, including evaluations of 17 of Device Company's products. Surgeon A and BALZER knew, however, that Surgeon A had performed substantially fewer than 80 hours of consulting and that, in fact, Surgeon A had never even used 14 of the 17 products Surgeon A and BALZER claimed Surgeon A had evaluated. During this four-month period, Surgeon A used approximately $506,670 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about August 4, 2014 in which he generated $95,200 in revenue for Device Company by using an excessive amount of Biologic 1. On or about December 6 and December 10, 2014, Executive 2 signed the two Surgeon A timesheets and approved the 80 hours submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

u. On or about November 18, 2014, Device Company paid BIOinnovations $113,801.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in between July 2014 and October 2014.

v. On or about December 18, 2014, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008178 to Surgeon A in the amount of $38,000, claiming that the payment was for "Consult[ing] July-Oct 2014." The $38,000 represented 80 hours at Surgeon A's hourly consulting rate of $500, minus Expert Company's 5% fee.

*Kickback #7 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between January and February 2015*

w. On or about March 12, 2015, Executive 2 sent Surgeon A an email, copying BALZER, in which Executive 2 told Surgeon A that Device Company was increasing his purported hourly rate from $500 to $750 based on his "increased consulting involvement on product development." In fact, Surgeon A was not increasing his consulting involvement on product development and Executive 2 knew that. Executive 2 continued to approve payments to Surgeon A (i) based on the amount of Device Company product Surgeon A used and (ii) not knowing how much consulting Surgeon A actually performed.

x. On or about April 1, 2015, BALZER faxed two timesheets he prepared to Expert Company with the cut-and-pasted signatures of Surgeon A. The first timesheet represented that Surgeon A had performed 40 hours of consulting for Device Company in January 2015. Surgeon A and BALZER knew that Surgeon A had performed no consulting for Device Company that month. During that month, Surgeon A used approximately $226,070 worth of Device Company products in his surgeries, including a single surgery on a Missouri

Medicaid beneficiary on or about January 19, 2015 in which he generated $96,650 in revenue for Device Company by using an excessive amount of certain Device Company products. The second timesheet represented that Surgeon A had performed 46 hours of consulting for Device Company in February 2015. Surgeon A and BALZER knew that Surgeon A performed no consulting for Device Company that month. During that month, Surgeon A used approximately $180,370 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries. On or about April 1, 2015, Executive 2 signed both Surgeon A's January and February 2015 timesheets and approved all 86 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

   y. On or about February 20, 2015, Device Company paid BIOinnovations $95,915 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in January 2015.

   z. On or about March 20, 2015, Device Company paid BIOinnovations $145,213 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in February 2015.

   aa. On or about April 14, 2015, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company deposited into a bank account Surgeon A controlled a total of $61,275, which represented the 86 hours that BALZER and Surgeon A reported for January and February 2015 at Surgeon A's then-new hourly consulting rate of $750, minus Expert Company's 5% fee.

COUNT ONE
Conspiracy to Commit Violations of the Anti-Kickback Statute
(18 U.S.C. § 371)

The United States Attorney charges:

18.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-17 of this Information.

19.     Between in or about late 2012 and October 2015, in the District of Massachusetts, and elsewhere, the defendant,

JOHN BALZER,

conspired with others to commit an offense against the United States, *i.e.*, to violate the Anti-Kickback Statute, by to knowingly and willfully offering, paying, soliciting, and receiving remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to induce the purchase of, order of, arranging for, use of, and recommendation of goods, services and items, namely, Device Company spinal implants, for which payment may be made in whole or in part by a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1-2).

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## Witness Tampering
## (18 U.S.C. § 1512(b))

The United States Attorney further charges:

20.     The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 13 of this Information.

21.     On or about February 9, 2019, in the District of Massachusetts, and elsewhere, the defendant,

## JOHN BALZER,

(a) did knowingly attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to influence, delay, and prevent the testimony of Surgeon A in an official proceeding; and (b) did knowingly attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense, to wit:  BALZER advised Surgeon A to tell the U.S. Attorney's Office and the grand jury:  (i) that Surgeon A had performed legitimate consulting for Device Company in an amount equal to the hours BALZER and Surgeon A had reported; and (ii) that Surgeon A was surprised that, and did not believe that, Device Company was missing documentation showing Surgeon A's feedback and consulting work when, in fact, BALZER knew that neither representation was true.

All in violation of Title 18, United States Code, Section 1512(b).

## CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

22. Upon conviction of one or more of the offenses set forth in Counts One (18 U.S.C. § 371) and Two (18 U.S.C. § 1512), the defendant,

### JOHN BALZER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense. The property to be forfeited includes, but is not limited to the following:

   a. $1,264,501, to be entered in the form of a forfeiture money judgment.

23. If any of the property described in Paragraph 22, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 22 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).


  /s/ Patrick M. Callahan
PATRICK M. CALLAHAN (BBO# 648173)
ABRAHAM R. GEORGE
DAVID J. DERUSHA
Assistant United States Attorneys
1 Courthouse Way
John Joseph Moakley Courthouse
Boston, MA  02210
Telephone:  (617) 748-3100
Patrick.Callahan@usdoj.gov

DISTRICT OF MASSACHUSETTS,   August 17  , 2020

Case 1:20-cr-10158-WGY   Document 1   Filed 08/17/20   Page 19 of 19