

**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

May 12, 2020

Daniel O. Herrington, Esq.
Rouse Frets White Goss Gentile Rhodes, P.C.
4510 Belleview Avenue, Suite 300
Kansas City, MO 64111

Re:     United States v. John Balzer
           Criminal No. 20cr10158-WGY

Dear Attorney Herrington:

The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, John Balzer ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

1.       Change of Plea

At the earliest practicable date, Defendant shall waive indictment and plead guilty to the Information attached to this Plea Agreement charging him with:  Conspiracy to Violate the Anti-Kickback Statute, 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(A) and Tampering with a Witness, Victim, or an Informant in violation of 18 U.S.C. § 1512.  Defendant admits that he committed the crimes specified in these counts and is in fact guilty of each one.  Defendant agrees to the accuracy of the attached statement of facts.  Defendant also agrees to waive venue, to waive any applicable statute of limitations, and to waive any legal or procedural defects in the Information.

2.       Penalties

Defendant faces the following maximum penalties for Count I, Conspiracy to Violate the Anti-Kickback Statute:  incarceration for 5 years, supervised release for 3 years, a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greater, a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.  Defendant faces the following maximum penalties for Count II, Tampering with a Witness,

1

Victim, or an Informant: incarceration for 20 years, supervised release for 3 years, a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greater, a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

3. <u>Sentencing Guidelines</u>

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 23:

    a) Defendant's base offense level is 8 based on USSG § 2B4.1(a);

    b) Defendant's offense level is increased by 16 levels in accordance with USSG § 2B1.1(b)(1)(J) because the improper benefit conferred as a result of the offense was greater than $1.5 million but less than $3.5 million;

    c) Defendant's offense level is increased by 2 levels in accordance with USSG § 3C1.1 because the Defendant obstructed the administration of justice with respect to the investigation, and the obstructive conduct related to the Defendant's offense of conviction;

    d) Defendant's offense level is reduced by 3 levels in accordance with USSG § 3E1.1 because Defendant has accepted responsibility for his crimes.

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw his guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in his sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (himself or through counsel) indicates that he does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime(s) to which he is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4. <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence to the Court:

    a) incarceration at the low end of the Guidelines sentencing range as calculated by

the parties in Paragraph 3;

b)   12 months of supervised release;

c)   a mandatory special assessment of $200, which Defendant must pay to the Clerk of the Court by the date of sentencing;

d)   restitution as ordered by the Court; and

e)   forfeiture as set forth in Paragraph 6.

5.     <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge his conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence.  Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that his conviction or sentence should be overturned.

Defendant understands that he has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a)   He will not challenge his <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b)   He will not challenge his <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, he is agreeing that his conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge his conviction and sentence, regardless of whether he later changes his mind or finds new information that would have led him not to agree to give up these rights in the first place.</u>

Defendant acknowledges that he is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that his lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in intentional misconduct serious enough to entitle Defendant to have his conviction or sentence overturned.

6.     Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, an amount equal to the proceeds he obtained as a result of the offense in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $1,264,501 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property previously seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to his criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8.    Breach of Plea Agreement

Defendant understands that if he breaches any provision of this Agreement, Defendant cannot use that breach as a reason to withdraw his guilty plea. Defendant's breach, however, would give the U.S. Attorney the right to be released from his commitments under this Agreement, and would allow the U.S. Attorney to pursue any charges that were, or are to be, dismissed under this Agreement.

If Defendant breaches any provision of this Agreement, the U.S. Attorney would also have the right to use against Defendant any of Defendant's statements, and any information or materials he provided to the government during investigation or prosecution of his case. The U.S. Attorney would have this right even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Finally, if Defendant breaches any provision of this Agreement, he thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.    Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.    Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Patrick Callahan.

Sincerely,

ANDREW E. LELLING
United States Attorney

By: **AMANDA STRACHAN**
Digitally signed by AMANDA STRACHAN
Date: 2020.06.02 17:31:55 -04'00'

AMANDA P.M. STRACHAN
Chief, Health Care Fraud Unit

Date: _____

**PATRICK CALLAHAN**
Digitally signed by PATRICK CALLAHAN
Date: 2020.06.02 17:10:01 -04'00'

PATRICK M. CALLAHAN
Assistant U.S. Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crimes I am pleading guilty to, and the maximum penalties for those crimes. I have discussed the Sentencing Guidelines with my lawyer and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me and we have had enough time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offenses. I believe this Agreement is in my best interest.

JOHN BALZER
Defendant

Date: 5/28/2020

I certify that John Balzer has read this Agreement and that we have discussed what it means. I believe John Balzer understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

DANIEL O. HERRINGTON
Attorney for Defendant

Date: 5/28/2020

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOHN BALZER,

Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No. 20cr10158

Violations:

Count One: Conspiracy
(18 U.S.C. § 371)

Count Two: Tampering with a Witness,
Victim, or an Informant
(18 U.S.C. § 1512(b))

Forfeiture Allegation:
(18 U.S.C. § 982(a)(7))

INFORMATION

At all times relevant to this Information:

General Allegations

1.      The defendant, JOHN BALZER ("BALZER"), lived in Lenexa, Kansas and was

the owner of BIOinnovations LLC ("BIOinnovations").

2.      BIOinnovations was a limited liability company located at 8645 Woodland

Terrace, Lenexa, Kansas, 66220.  Among other things, BIOinnovations acted as a distributor for

medical device manufacturers.

3.      Surgeon A was a spine surgeon who lived in Lawson, Missouri and practiced

medicine in Missouri and Kansas.

4.      Device Company was a medical device company located in Malden,

Massachusetts that sold implants used in spine surgeries, such as plates, cages, screws, rods, and

biologics.  While Device Company employed sales representatives to assist and provide support

1

to physicians who used its products, Device Company worked with distributors, like

BIOinnovations and BALZER, to provide customer support in some areas of the country.

Distributors like BIOinnovations and BALZER were independent contractors and not full-time

employees of Device Company.

5.      Executive 1 was Device Company's President, Chief Executive Officer, and

Director.

6.      Executive 2 was Device Company's Chief Financial Officer and Vice President of

Business Development.

7.      Expert Company was a limited liability company owned by Executive 1 that

purported to manage the process under which Device Company's physician-consultants received

payments for their purported consulting beginning in 2013.

<u>Background on Spine Surgeries and Their Reimbursement</u>

8.      Hospitals or surgical centers where surgeons perform spine surgeries, such as

spinal fusion surgery, typically submit a bill to a patient or a claim for reimbursement to an

insurance carrier, including the Medicare Program ("Medicare") or Medicaid Program

("Medicaid"), for the costs associated with a surgery, including the costs of medical device, such

as spinal implants.  Physicians typically submit a separate claim for reimbursement to patients

and/or insurance carriers, including Medicare or Medicaid, for the physician's services rendered

during the surgical procedure.

9.      Spinal implants, such as screws, rods, cages, and plates are often kept in trays or

kits that are held on a consignment basis at a hospital or surgical center where physicians

perform spine surgeries.  When a physician uses a spinal implant in a surgery, such as a spinal

fusion procedure, the hospital or surgical center orders a replenishment implant and pays the

implant manufacturer for that replenished implant.  Often, a hospital or surgical center sends

replenishment orders to an implant manufacturer, like Device Company, on a surgery-by-surgery

basis so that kits or trays from which the implant was used are complete and ready to be used in a

future surgery.

<u>The Medicare and Medicaid Programs</u>

10.     Medicare is a federally-funded health care program that provides benefits to

individuals who are sixty-five years of age or older, or disabled.  Medicare is administered by the

Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States

Department of Health and Human Services.  Medicare is a "health care benefit program" as

defined by 18 U.S.C. § 24(b).  Individuals who qualify for Medicare benefits are commonly

referred to as Medicare "beneficiaries."

11.     Medicare is subdivided into multiple Parts.  Medicare Part A covers health

services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.

Medicare Part B covers physician services and outpatient care.

12.     Medicaid is a jointly-funded, federal and state health care program that provides

certain health benefits to the disabled, as well as to individuals and families with low incomes

and resources.  At the federal level, Medicaid is administered by CMS.  CMS is responsible for

overseeing the Medicaid program in participating states, including Massachusetts, Kansas, and

Missouri.

13.     Medicare and Medicaid are "health care benefit programs" within the meaning of

18 U.S.C. § 24(b), and each is a "Federal health care program" as defined by 42 U.S.C. § 1320a-

7b(f), the federal Anti-Kickback Statute.

Overview of the Conspiracy

14.     Between late 2012 and October 2015, BALZER, Surgeon A, and their co-

conspirators engaged in a scheme in which Device Company paid Surgeon A $379,000 pursuant

to a sham consulting program that paid Surgeon A between $500 and $750 per hour for

supposedly performing consulting services.  Although Device Company's physician-consulting

program was purportedly directed at gathering technical feedback about its products from

surgeons, in fact, Device Company used the program, and the kickbacks it paid to Surgeon A

pursuant to that program, to induce Surgeon A to order and use Device Company's products and

to reward his use of Device Company's products.  Over the period of time covered by the

conspiracy, BALZER, Surgeon A, and their co-conspirators represented that Surgeon A had

spent hundreds of hours evaluating products, discussing industry trends, and educating residents.

In fact, as BALZER and Surgeon A well knew, Surgeon A spent only a small fraction of his

reported time performing actual consulting activities for Device Company.  In exchange for the

consulting payments from Device Company, Surgeon A used over $4.5 million of Device

Company's products in his surgeries, including excessive amounts of certain products.  During

this time, Surgeon A performed numerous surgeries on patients who were Medicare or Medicaid

beneficiaries, often with the assistance of BALZER.  Device Company agreed with BALZER to

pay him a 25% commission on all Device Company products Surgeon A used in his surgeries.

<u>Object and Purpose of the Kickback Conspiracy</u>

15.     The object of the conspiracy was for BALZER, Surgeon A, and their co-conspirators to unlawfully enrich themselves by offering, paying, soliciting, and receiving kickbacks aimed at inducing Surgeon A to order, arrange for, use, and recommend Device Company's spinal implants in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

<u>The Manner and Means</u>

16.     Among the manner and means by which BALZER, Surgeon A, and their co-conspirators, known and unknown, carried out the conspiracy were the following:

  a.  Setting up a sham physician-consulting program at Device Company purportedly directed at gathering technical feedback about Device Company's products.

  b.  Selecting surgeons like Surgeon A to participate in Device Company's sham physician-consulting program based not on their background, qualifications, education, and experience, but instead on their ability and willingness to use Device Company's products.

  c.  Executing a sham consulting agreement under which Surgeon A would be paid for using Device Company's spine products in his spine surgeries.

  d.  Arranging for Surgeon A to receive 10% of the revenue Device Company generated from Surgeon A's use of Device Company's products in his surgeries.

  e. Filling out and submitting to Device Company falsified timesheets representing that Surgeon A had performed a significant number of hours of consulting work for Device Company, when, in fact, Surgeon A did little to no consulting work for Device Company and instead simply used Device Company's products in his surgeries often in the presence of, or at the prompting of, BALZER.

  f. Paying Surgeon A for his use of Device Company's products in his spine surgeries under the pretext that he performed consulting work.

  g. Tracking the sales volumes of Surgeon A and other physician-consultants and using that information to determine how much Surgeon A and other physician-consultants would be paid.

  h. Using, and arranging for the use of, an excessive amount of Device Company's spine products in Surgeon A's spine surgeries.

  i. Increasing Surgeon A's hourly rate based not on his experience or the quality of his work, but on his anticipated use of Device Company's products in his surgeries.

<u>Overt Acts in Furtherance of the Conspiracy</u>

17. From in or about late 2012 through October 2015, BALZER, Surgeon A, and their co-conspirators known and unknown to the U.S. Attorney, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

*Executive 2 agreed to pay Surgeon A 10% of the revenue Surgeon A's surgeries generated for Device Company and paid Surgeon A Kickback #1*

a.      In late 2012 / early 2013, BALZER had a phone conversation with Executive 2 about Surgeon A becoming a consultant.  In that conversation, Executive 2 told BALZER that Surgeon A would get 10% of the revenue Device Company made from Surgeon A's surgeries.

b.      On or about March 8, 2013, Surgeon A had a phone conversation with Executive 1 in which Executive 1 told Surgeon A that he wanted Surgeon A to use as many different Device Company products as he could.  Executive 1 told Surgeon A that the more products Surgeon A used, the more money Surgeon A would make.

c.      On or about March 11, 2013, Executive 2 sent an email to Surgeon A attaching a Clinical Advisor / Consulting Agreement that permitted Surgeon A to bill Device Company up to 600 hours and $300,000 annually based on Surgeon A's "increased interest and availability for feedback on several" Device Company products.

d.      On or about March 12, 2013, Surgeon A had a conversation with a Territory Sales Manager for Device Company in which Surgeon A and he discussed using Device Company's product for all of his cases.  On that same date, the Territory Sales Manager sent an email to Executive 1 and Executive 2 explaining that he had spoken to Surgeon A, who "understands our position is willing to totally involve himself and use [Device Company] for all of his cases."

e.      On or about May 13, 2013, an employee of Device Company sent an email to Executive 2, copying Executive 1.  In that email, the employee explained that he had spoken to Surgeon A and that Surgeon A wanted to know the start date of his consulting

agreement and wanted to "backdate based on previous cases" he had performed using Device Company product.

f.      On or about May 22, 2013, Device Company sent Check No. 3185 signed by Executive 1 to Surgeon A in the amount of $5,000.  At this point time, Surgeon A had not signed his consulting agreement with Device Company and had not submitted any timesheets documenting any purported consulting he performed.

*Kickback #2 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between May 1, 2013 and June 15, 2013*

g.      On or about June 15, 2013, BALZER faxed to Device Company an Exhibit A timesheet prepared by BALZER stating that Surgeon A had performed 75 hours of consulting for Device Company between May 1, 2013 and June 15, 2013, when, in fact, BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 75 hours of consulting.  During that six-week time period and pursuant to Surgeon A's agreement with Device Company, Surgeon A used $388,985 worth of Device Company products in his surgeries, including a single surgery on a Medicare beneficiary on or about June 10, 2013 in which he generated $95,950 in revenue for Device Company by using an excessive amount of Device Company's biologic product ("Biologic 1").  Executive 2 signed Surgeon A's timesheet and approved the 75 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

h.      On or about June 20, 2013, Device Company paid BALZER's distribution company, BIOinnovations, $63,750 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between May 1, 2013 and June 15, 2013.

i.      On or about July 11, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3380 signed by Executive 1 to Surgeon A in the amount of $37,500, or approximately 10% of the amount Surgeon A's surgeries generated for Device Company between May 1, 2013 and June 15, 2013.

*Kickback #3 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between June 16, 2013 and August 1, 2013*

j.      On August 1, 2013, BALZER faxed to Device Company a timesheet he prepared stating that Surgeon A had performed 84 hours of consulting for Device Company between June 16, 2013 and August 1, 2013 when, in fact, both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 84 hours of consulting.  During that six-week time period, Surgeon A used $420,135 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about July 22, 2013 in which he generated $104,800 in revenue for Device Company by using an excessive amount of Biologic 1.   Executive 2 signed Surgeon A's timesheet and approved the 84 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

k.      On or about July 22, 2013, Device Company paid BIOinnovations $73,106.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between June 16, 2013 and August 1, 2013.

l.      On or about September 17, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3666 signed by Executive 1 to Surgeon A in the amount of $42,000, or approximately 10% of the

revenue Surgeon A's surgeries generated for Device Company between June 16, 2013 and August 1, 2013.

> *Kickback #4 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between August 2, 2013 and September 15, 2013*

m.     On or about October 3, 2013, BALZER faxed to Device Company a timesheet BALZER prepared stating that Surgeon A had performed 24 hours of consulting for Device Company between August 2, 2013 and September 15, 2013 when both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than 24 hours of consulting. During that six-week time period, Surgeon A used $125,805 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.  Executive 2 signed Surgeon A's timesheet and approved the 24 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

n.     On or about October 4, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3739 signed by Executive 1 to Surgeon A in the amount of $12,000, or approximately 10% of the revenue Surgeon A's surgeries generated for Device Company between August 1, 2013 and September 15, 2013.

o.     On or about September 23, 2013 and October 21, 2013, Device Company paid BIOinnovations $91,455 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between August 2, 2013 and September 15, 2013.

p.      On or about October 4, 2013, Executive 2 sent an email to Surgeon A, BALZER and Executive 1, attaching a new, sham consulting agreement under which Expert Company (whose only employee was Executive 1's then girlfriend) would pay Surgeon A for consulting hours Surgeon A purportedly performed for Device Company, which was one of Expert Company's clients.  While the email and agreement implied that Device Company was one of a number of clients of Expert Company, Device Company was in fact Expert Company's only client.

*Kickback #5 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product in March 2014*

q.      On or about May 5, 2014, BALZER faxed a timesheet that he prepared and that Surgeon A signed, to Expert Company, which was handling consulting payments for Device Company pursuant to the new consulting agreement.  The timesheet stated that Surgeon A had performed 32 hours of consulting for Device Company in March 2014, when both BALZER and Surgeon A knew that Surgeon A had performed substantially fewer than even 20 hours of consulting.  During that month, Surgeon A used $100,945 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.  On or about May 5, 2014, Executive 2 signed Surgeon A's timesheet and approved the 20 hours (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

r.      On or about April 21, 2014, Device Company paid BIOinnovations $80,785 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries during March 2014.

11

s.      On or about May 13, 2014, in return for Surgeon A using Device

Company's products and pursuant to their agreement, Expert Company sent Check No.

0000008031 to Surgeon A in the amount of $9,500, or approximately 10% of the amount

Surgeon A's surgeries generated for Device Company during March 2014, minus a 5% fee

charged by Expert Company.

*Kickback #6 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between July 2014 and October 2014*

t.      On or about December 6, 2014 and December 10, 2014, BALZER sent

Expert Company two timesheets he prepared with Surgeon A's signature stating that Surgeon A

had performed 80 hours of consulting for Device Company between July and October 2014,

including evaluations of 17 of Device Company's products.  Surgeon A and BALZER knew,

however, that Surgeon A had performed substantially fewer than 80 hours of consulting and that,

in fact, Surgeon A had never even used 14 of the 17 products Surgeon A and BALZER claimed

Surgeon A had evaluated.  During this four-month period, Surgeon A used approximately

$506,670 worth of Device Company products in his surgeries, including a single surgery on a

Missouri Medicaid beneficiary on or about August 4, 2014 in which he generated $95,200 in

revenue for Device Company by using an excessive amount of Biologic 1.  On or about

December 6 and December 10, 2014, Executive 2 signed the two Surgeon A timesheets and

approved the 80 hours submitted (i) based on the amount of Device Company product Surgeon A

used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A

actually performed.

u.      On or about November 18, 2014, Device Company paid BIOinnovations $113,801.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in between July 2014 and October 2014.

v.      On or about December 18, 2014, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008178 to Surgeon A in the amount of $38,000, claiming that the payment was for "Consult[ing] July-Oct 2014."  The $38,000 represented 80 hours at Surgeon A's hourly consulting rate of $500, minus Expert Company's 5% fee.

*Kickback #7 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between January and February 2015*

w.      On or about March 12, 2015, Executive 2 sent Surgeon A an email, copying BALZER, in which Executive 2 told Surgeon A that Device Company was increasing his purported hourly rate from $500 to $750 based on his "increased consulting involvement on product development."  In fact, Surgeon A was not increasing his consulting involvement on product development and Executive 2 knew that.  Executive 2 continued to approve payments to Surgeon A (i) based on the amount of Device Company product Surgeon A used and (ii) not knowing how much consulting Surgeon A actually performed.

x.      On or about April 1, 2015, BALZER faxed two timesheets he prepared to Expert Company with the cut-and-pasted signatures of Surgeon A.  The first timesheet represented that Surgeon A had performed 40 hours of consulting for Device Company in January 2015.  Surgeon A and BALZER knew that Surgeon A had performed no consulting for Device Company that month.  During that month, Surgeon A used approximately $226,070 worth of Device Company products in his surgeries, including a single surgery on a Missouri

Medicaid beneficiary on or about January 19, 2015 in which he generated $96,650 in revenue for Device Company by using an excessive amount of certain Device Company products.  The second timesheet represented that Surgeon A had performed 46 hours of consulting for Device Company in February 2015.  Surgeon A and BALZER knew that Surgeon A performed no consulting for Device Company that month.  During that month, Surgeon A used approximately $180,370 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.   On or about April 1, 2015, Executive 2 signed both Surgeon A's January and February 2015 timesheets and approved all 86 hours he submitted (i) based on the amount of Device Company product Surgeon A used and (ii) without taking any steps to confirm or assess how much consulting Surgeon A actually performed.

y.      On or about February 20, 2015, Device Company paid BIOinnovations $95,915 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in January 2015.

z.      On or about March 20, 2015, Device Company paid BIOinnovations $145,213 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in February 2015.

aa.      On or about April 14, 2015, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company deposited into a bank account Surgeon A controlled a total of $61,275, which represented the 86 hours that BALZER and Surgeon A reported for January and February 2015 at Surgeon A's then-new hourly consulting rate of $750, minus Expert Company's 5% fee.

COUNT ONE
Conspiracy to Commit Violations of the Anti-Kickback Statute
(18 U.S.C. § 371)

The United States Attorney charges:

18.    The United States Attorney re-alleges and incorporates by reference paragraphs 1-17 of this Information.

19.    Between in or about late 2012 and October 2015, in the District of Massachusetts, and elsewhere, the defendant,

JOHN BALZER,

conspired with others to commit an offense against the United States, *i.e.*, to violate the Anti-Kickback Statute, by to knowingly and willfully offering, paying, soliciting, and receiving remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to induce the purchase of, order of, arranging for, use of, and recommendation of goods, services and items, namely, Device Company spinal implants, for which payment may be made in whole or in part by a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1-2).

All in violation of Title 18, United States Code, Section 371.

15

<u>COUNT TWO</u>
Witness Tampering
(18 U.S.C. § 1512(b))

The United States Attorney further charges:

20.     The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 13 of this Information.

21.     On or about February 9, 2019, in the District of Massachusetts, and elsewhere, the defendant,

JOHN BALZER,

(a) did knowingly attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to influence, delay, and prevent the testimony of Surgeon A in an official proceeding; and (b) did knowingly attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense, to wit:  BALZER advised Surgeon A to tell the U.S. Attorney's Office and the grand jury:  (i) that Surgeon A had performed legitimate consulting for Device Company in an amount equal to the hours BALZER and Surgeon A had reported; and (ii) that Surgeon A was surprised that, and did not believe that, Device Company was missing documentation showing Surgeon A's feedback and consulting work when, in fact, BALZER knew that neither representation was true.

All in violation of Title 18, United States Code, Section 1512(b).

16

## CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

22.     Upon conviction of one or more of the offenses set forth in Counts One (18

U.S.C. § 371) and Two (18 U.S.C. § 1512), the defendant,

### JOHN BALZER,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7),

any property, real or personal, which constitutes or is derived, directly or indirectly, from gross

proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to the

following:

a.     $1,264,501, to be entered in the form of a forfeiture money judgment.

23.     If any of the property described in Paragraph 22, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of

the defendant --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 22 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).


 /s/ Patrick M. Callahan
PATRICK M. CALLAHAN (BBO# 648173)
ABRAHAM R. GEORGE
DAVID J. DERUSHA
Assistant United States Attorneys
1 Courthouse Way
John Joseph Moakley Courthouse
Boston, MA  02210
Telephone:  (617) 748-3100
Patrick.Callahan@usdoj.gov

DISTRICT OF MASSACHUSETTS,  August 17 , 2020

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 20cr10158-WGY |
| JOHN BALZER, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## STATEMENT OF FACTS IN SUPPORT OF GUILTY PLEA

The United States of America submits this statement of facts that the United States would have presented if this matter had gone to trial. The facts presented below prove, beyond a reasonable doubt, that the defendant, JOHN BALZER ("BALZER"), (1) conspired with others to commit an offense against the United States, *i.e.*, to violate the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(1-2)), that is, to knowingly and willfully offer, pay, solicit, and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to induce the purchase of, order of, arranging for, use of, and recommendation of goods, services, and items, that is, Device Company's spinal implants, for which payment may be made in whole or in part by a Federal health care program, in violation of Title 18, United States Code, Section 371, and (2) did knowingly (a) attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to influence, delay, and prevent the testimony of Surgeon A in an official proceeding; and (b) attempt to use intimidation and to corruptly persuade another person, to wit, Surgeon A, with the intent to hinder, delay, or prevent

1

the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense, in violation of Title 18, United States Code, Section 1512(b).

1.      BALZER lived in Lenexa, Kansas and was the owner of BIOinnovations LLC ("BIOinnovations").

2.      BIOinnovations was a limited liability company located at 8645 Woodland Terrace, Lenexa, Kansas, 66220.  Among other things, BIOinnovations acted as a distributor for medical device manufacturers.

3.      Surgeon A was a spine surgeon who lived in Lawson, Missouri and practiced medicine in Missouri and Kansas.

4.      Device Company was a medical device company located in Malden, Massachusetts that sold implants used in spine surgeries, such as plates, cages, screws, rods, and biologics.   Device Company worked with distributors, like BIOinnovations and BALZER, to provide customer support in Missouri and Kansas.

5.      Executive 1 was Device Company's President, Chief Executive Officer, and Director.

6.      Executive 2 was Device Company's Chief Financial Officer and Vice President of Business Development.

7.      Expert Company was a limited liability company that purported to manage the process under which Device Company's physician-consultants received payments for their purported consulting beginning in 2013.

8.      Between late 2012 and October 2015, BALZER, Surgeon A and their co-conspirators engaged in a scheme in which Device Company paid Surgeon A $379,000 pursuant to a sham consulting program that paid Surgeon A between $500 and $750 per hour for supposedly performing consulting services.  Although Device Company's physician-consulting program was purportedly directed at gathering technical feedback about its products from surgeons, in fact, Device Company used the program, and the kickbacks it paid to Surgeon A pursuant to that program, to induce Surgeon A to order and use Device Company's products and to reward his use of Device Company's products.

9.      Between late 2012 and October 2015, Surgeon A, BALZER, and others involved in the sham consulting program represented that Surgeon A had spent hundreds of hours evaluating products, discussing industry trends, and educating medical residents.  In fact, Surgeon A had spent only a small fraction of his reported time performing actual consulting activities for Device Company.  In exchange for the sham consulting payments from Device Company, Surgeon A used over $4.5 million worth of Device Company's products in his surgeries, including excessive amounts of Device Company's biologic product ("Biologic 1").  During this time, Surgeon A performed numerous surgeries on patients who were Medicare or Medicaid beneficiaries, often with the assistance of BALZER.  Device Company agreed with BALZER to pay him a 25% commission on all Device Company products Surgeon A used in his surgeries.

*Executive 2 agreed to pay Surgeon A 10% of the revenue Surgeon A's surgeries generated for Device Company and sent Surgeon A Kickback #1*

10.     In late 2012 / early 2013, BALZER had a phone conversation with Executive 2 about Surgeon A becoming a consultant.  In that conversation, Executive 2 told BALZER that Surgeon A would get 10% of the revenue Device Company made from Surgeon A's surgeries.

11.     On or about May 22, 2013, Device Company sent Check No. 3185 signed by Executive 1 to Surgeon A in the amount of $5,000.  At this point time, Surgeon A had not signed his consulting agreement with Device Company and had not submitted any timesheets documenting any purported consulting he performed.

*Kickback #2 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between May 1, 2013 and June 15, 2013*

12.     On or about June 15, 2013, BALZER faxed to Device Company a timesheet he prepared stating that Surgeon A had performed 75 hours of consulting for Device Company between May 1, 2013 and June 15, 2013 when, in fact, Surgeon A and BALZER knew that Surgeon A had performed substantially fewer than 75 hours of consulting.  During that six-week time period and pursuant to Surgeon A's agreement with Device Company, Surgeon A used $388,985 worth of Device Company products in his surgeries, including a single surgery on a Medicare beneficiary on or about June 10, 2013 in which he generated $95,950 in revenue for Device Company by using an excessive amount of Biologic 1.

13.     On or about June 20, 2013, Device Company paid BALZER's distribution company, BIOinnovations, $63,750 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between May 1, 2013 and June 15, 2013.

14.     On or about July 11, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3380 signed by Executive 1 to Surgeon A in the amount of $37,500, which amounted to approximately 10% of the revenue Surgeon A's surgeries generated for Device Company between May 1, 2013 and June 15, 2013.

*Kickback #3 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between June 16, 2013 and August 1, 2013*

15.     On August 1, 2013, BALZER faxed to Device Company a timesheet prepared by BALZER stating that Surgeon A had performed 84 hours of consulting for Device Company between June 16, 2013 and August 1, 2013, when, in fact, both Surgeon A and BALZER knew that Surgeon A had performed substantially fewer than 84 hours of consulting.  During that six-week time period, Surgeon A used $420,135 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about July 22, 2013 in which he generated $104,800 in revenue for Device Company by using an excessive amount of Biologic 1.

16.      On or about July 22, 2013, Device Company paid BIOinnovations $73,106.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between June 16, 2013 and August 1, 2013.

17.     On or about September 17, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3666 signed by Executive 1 to Surgeon A in the amount of $42,000, which amounted to approximately 10% of the revenue Surgeon A's surgeries generated for Device Company between June 16, 2013 and August 1, 2013.

*Kickback #4 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between August 2, 2013 and September 15, 2013*

18.     On or about October 3, 2013, BALZER faxed to Device Company a timesheet he prepared stating that Surgeon A had performed 24 hours of consulting for Device Company between August 2, 2013 and September 15, 2013 when both Surgeon A and BALZER knew that Surgeon A had performed substantially fewer than 24 hours of consulting.  During that six-week time period, Surgeon A used $125,805 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.

19.     On or about October 4, 2013, in return for Surgeon A using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3739 signed by Executive 1 to Surgeon A in the amount of $12,000, which amounted to approximately 10% of the revenue Surgeon A's surgeries generated for Device Company between August 1, 2013 and September 15, 2013.

20.     On or about September 23, 2013 and October 21, 2013, Device Company paid BIOinnovations $91,455 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries between August 2, 2013 and September 15, 2013.

21.     On or about October 4, 2013, Executive 2 sent an email to Surgeon A, copying Executive 1 and BALZER.  The email attached a new sham consulting agreement under which Expert Company agreed to pay Surgeon A for purportedly consulting on behalf of Expert Company's "client," Device Company.

*Kickback #5 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product in March 2014*

22.    On or about May 5, 2014, BALZER faxed a timesheet that he prepared and that Surgeon A signed to Expert Company.  The timesheet stated that Surgeon A had performed 32 hours of consulting for Device Company in March 2014, when both Surgeon A and BALZER knew that Surgeon A had performed substantially fewer than even 20 hours of consulting. During that month, Surgeon A used $100,945 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.

23.    On or about April 21, 2014, Device Company paid BIOinnovations $80,785 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries during March 2014.

24.    On or about May 13, 2014, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008031 to Surgeon A in the amount of $9,500, which amounted to approximately 10% of the amount Surgeon A's surgeries generated for Device Company during March 2014, minus a 5% fee charged by Expert Company.

*Kickback #6 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between July 2014 and October 2014*

25.    On or about December 6, 2014 and December 10, 2014, BALZER sent Expert Company two timesheets he prepared with Surgeon A's signature stating that Surgeon A had performed 80 hours of consulting for Device Company between July and October 2014, including evaluations of 17 of Device Company's products.  Surgeon A and BALZER knew that Surgeon A had performed substantially fewer than 80 hours of consulting and that, in fact,

Surgeon A had never even used 14 of the 17 products Surgeon A and BALZER claimed Surgeon A had evaluated. During this four-month period, Surgeon A used approximately $506,670 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about August 4, 2014 in which he generated $95,200 in revenue for Device Company by using an excessive amount of Biologic 1.

26.     On or about November 18, 2014, Device Company paid BIOinnovations $113,801.25 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in between July 2014 and October 2014.

27.     On or about December 18, 2014, in return for Surgeon A using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008178 to Surgeon A in the amount of $38,000, claiming that the payment was for "Consult[ing] July-Oct 2014." The $38,000 represented 80 hours at Surgeon A's hourly consulting rate of $500, minus Expert Company's 5% fee.

*Kickback #7 – Payment to Surgeon A and BALZER for Surgeon A's use of Device Company product between January and February 2015*

28.     On or about March 12, 2015, Executive 2 sent Surgeon A an email in which he informed Surgeon A that Device Company was increasing his purported hourly rate from $500 to $750 based on his "increased consulting involvement on product development." In fact, Surgeon A was not increasing his consulting involvement on product development.

29.     On or about April 1, 2015, BALZER faxed two timesheets he prepared to Expert Company with the cut-and-pasted signatures of Surgeon A. The first timesheet represented that Surgeon A had performed 40 hours of consulting for Device Company in January 2015. Surgeon A and BALZER knew that Surgeon A had performed no consulting for Device Company that

month. During that month, Surgeon A used approximately $226,070 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about January 19, 2015 in which he generated $96,650 in revenue for Device Company by using an excessive amount of certain Device Company products. The second timesheet represented that Surgeon A had performed 46 hours of consulting for Device Company in February 2015. Surgeon A and BALZER knew that Surgeon A performed no consulting for Device Company that month. During that month, Surgeon A used approximately $180,370 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.

30.    On or about February 20, 2015, Device Company paid BIOinnovations $95,915 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in January 2015.

31.    On or about March 20, 2015, Device Company paid BIOinnovations $145,213 in commissions for, among other things, the sale of Device Company products that Surgeon A used in his surgeries in February 2015.

32.    On or about April 14, 2015, in return for Surgeon A using Device Company products and pursuant to their agreement, Expert Company deposited into a bank account Surgeon A controlled a total of $61,275, which represented the 86 hours Surgeon A and BALZER reported for January and February 2015 at Surgeon A's then-new hourly consulting rate of $750, minus Expert Company's 5% fee.

*BALZER's obstructive conduct in February 2019*

33.     On or about February 9, 2019, BALZER advised Surgeon A to tell the U.S.

Attorney's Office and the grand jury:  (i) that Surgeon A had performed legitimate consulting for

Device Company in an amount equal to the hours BALZER and Surgeon A had reported; and (ii)

that Surgeon A was surprised that, and did not believe that, Device Company was missing

documentation showing Surgeon A's feedback and consulting work when, in fact, BALZER

knew that neither representation was true.


Date: _____, 2020          Respectfully submitted,

                                       ANDREW E. LELLING
                                       UNITED STATES ATTORNEY


                                       PATRICK          Digitally signed by PATRICK
                                                        CALLAHAN
                              BY:      CALLAHAN         Date: 2020.08.17 15:27:36 -04'00'
                                       PATRICK M. CALLAHAN
                                       ABRAHAM R. GEORGE
                                       DAVID J. DERUSHA
                                       Assistant United States Attorneys

**Defendant's Acceptance of Factual Proffer**

I have read this Statement of Facts in Support of Guilty Plea and carefully reviewed every part of it with my attorneys. I am fully satisfied with the legal services provided by my attorneys in connection with this Statement of Facts and all matters relating to it. I fully understand this Statement of Facts and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth in the Plea Agreement.

s/28/2020
_____
Date

_____
JOHN BALZER
Defendant


**Defense Counsel's Acknowledgment**

I am the attorney for JOHN BALZER. I have reviewed every part of this Statement of Facts in Support of Guilty Plea with him. It accurately and completely sets forth the Statement of Facts agreed to by the defendant and the Office of the United States Attorney for the District of Massachusetts.

1/28/2020
_____
Date

_____
DANIEL O. HERRINGTON, ESQ.
Counsel for John Balzer

11